It's great to see you. Thank you for joining us. My name is Richard Langberg and I'm counsel for Stephen Wynn, and I'm going to endorse him as CEO. I am going to endeavor to save three minutes for the rest of the talk. I'm going to assume for the moment that a famous investor was invested in a foreign market or a foreign sector that he was known for and did very deep research and found proof that members of the investments or companies that he was investing in had committed bribes to foreign officials, decided to then go short, and then was asked in a symposium why he went short. What would he say? Well, what he might say is, I got a little nervous, as you probably have. But the answer really got concerned with the response taken by the Finance Committee under FCQA and a variety of other aspects of exactly how businesses are doing. But I guess the difference is, of course, that here we all know and we're probably going to have a chance to see the next few years. I don't know that he found definitive proof of the contributions of foreign companies, but he found enough to be worried about the debt level. And that's the opinion that he communicated to the audience. So that's why I guess I have – that's my first major problem with hearing these stories, that you come out and say, I have done my research and I have definitively concluded that there are the following motivations that are occurring. One further thing, I found enough to be worried and to be able to arrange what conduct would cross my mind. But I've seen enough that's close enough to my head. Let me be true here. First, I would say that some might understand, and that's why I started kind of on the flip side. What if he did find violations of the FCQA? And he was asked, why did he go short and use the same exact words? That is something that a reasonable listener could understand. When you say, I went digging, and I felt concerned about the risk I was taking on my client's money under the FCQA. But digging out, if it was digging your interpretation, then you have a mixed opinion problem. Even if he was suggesting that there were things that caused him to have a concern about potential violations of the FCQA, in the context that he said it is failure to disclose the facts upon which that opinion was based. If those facts are going to be assumed that is false, there is a need to believe that you have facts that you base it upon, and those assumed facts are inferred facts are not true. In the opening of itself, you have committed a defamation. I'm going to hear that the company's own business seems to have a technology that we have. It's homework. It's a serendipity. And he can't assure you for silver that we won't be found to have violated this law, given it's the law. I mean, that alone, it seems to me, is an acknowledgment that whatever Mr. Chen has found, the company's not prosecuting that there were at least two. There was conduct that maybe got close to the line. I'm not saying that it went over, but it was close enough that there were risks. Risks that the company would either be investigated or prosecuted. And that was enough to make someone want to make a different investment decision. That is all. I think we agree that a reasonable jury can infer from what this gentleman said. If one were to conflate several issues, as the respondents attempted to by their companies, that conclusion would be reasonable. But, your Honor, respectfully, it does conflate. I think we need to walk through the elements one by one. First, is the statement reasonably susceptible to a defamatory meaning? Next, is there evidence of falsity? Next, is there evidence of actual malice? And when we're just talking about whether or not the statement is susceptible to a defamatory meaning, which is really the core, the main part of the lower court's decision, the question isn't what was in the reports, what wasn't in the reports, because it wasn't disclosed to the listeners. Perhaps if it was, it would be like if it was. I'm saying the only reasonable, and I still think this is even defamatory, in my opinion, upon doing further research, I think there are sufficient risks that this company might be found to, or at least be investigated for, violations of whatever is the form of a preface to that. I think if my money would be better invested on sort of, that's just my, offering my opinion. You ask me why I went short, that's why I went short. There's no defamatory meaning in there. It's just that person's opinion about what they found. Now, you can argue about whether there was enough there for this person to change their investment look, but we'll find out you can't prove that it's from a false instance, and I'm not sure you can find that in your favor. Well, here's what this company said. He said that he was concerned about the risk aspect of it. At first, he talked about how he had been long on corruption and done very well with that. It was euphemistic. He was talking about a region of the world where corruption existed. The whole movie that they saw beforehand was about that. He had been long on corruption, but after digging deeper, even he became concerned about the risk he was taking with his money, his client's money, under the FCPA. Now, if he had said that I had risks because of potential FCPA violations, perhaps. If he had said, I uncovered some information that suggests that there might be a risk under the FCPA because there were these SEC filings, which didn't exist, by the way, at the time that he made it short. That came years later than perhaps. And I do think, you know, I'm going to have to go later to this, but I think that at least as to whether it's reasonably susceptible to the interpretation we offer, we have to look at the linguist opinion that we offer. We have, of course, out of the state of California, the Mueller decision, I think, that suggests or defines that when considering figuratory meaning, a linguistic expert is useful to interpret the juxtaposition of words, which is all over our Greek theorem areas. So, the juxtaposition of words, tone, timing, et cetera, in order to make an assessment of how a reasonable reader might interpret them. We offered the opinion of one of the foremost linguistic experts in the world. They offered a counter opinion. They didn't go to court. They didn't consider it. They should have because he is one of the foremost linguistic experts in the world. So, if we say that the juxtaposition of those words is going to result, potentially even, in a reasonable listener interpreting it the way we offer, then there's a question of fairness to the jury. And this can't be done on 12th of May, right? Because this is a court case. It's a two-sided thing. It's up for the court to decide whether it's just a palpable interpretation, something, of whether a reasonable reader could interpret it through a misinterpreting. So, in this context, when, again, when we have a linguistics expert who has unquestionable and impeccable credentials, I think that it's impossible to find as a matter of odds it couldn't be interpreted in the way that it was offered. By the way, Your Honor, one more important factor, I apologize. This was cited in our brief, but I want to elaborate on it because the question that followed a few minutes later from one of the listeners suggested and understood it just as we suggested it was intended, and it's likely to be understood. One of the listeners remembers a comment he said. This is in the record. It's already on page 1528. He mentioned the SEPA. All these companies and casinos are American companies. So, you know, there's the Nevada Gaming Commission. There are other state and federal authorities that are supposed to, you know, hold sway and use their chance response. So, I mean, the fact of the matter is, I guess, you said the question goes without a copy to show the support of the opinion, but nothing that you just read supports your interpretation. Does it seem too ambiguous to you? Well, there's the, just tell me, and just plain language, what is it exactly that you think he was implying? Just let him. It undercover definitive proof of actual SEPA violations. Dr. Finnegan. Just what Dr. Finnegan said. Excuse me. So, Dr. Finnegan said that he had determined that there were violations of foreign corrupt practices, actual violations, and other folks that show on a risk that there might be an investigation. And that the risk of an investigation that comes from that put his money, his client's money at risk. That is, just because there's a violation of the SEPA doesn't mean that your clients are going to lose money. First, it has to be discovered. There has to be an investigation, et cetera. So, Mr. Chavez's later answer, I would just commend to the court, don't be able to answer that. And challenge this as being disadvantageous. That's why I would be careful in his answers. Well, I'm not challenging that statement, but it provides context. This is what he said. So, almost any company doing meaningful amounts of business in China probably could be found in violation of the SEPA. So, the question is, what is the political will to enforce this? Oh, but more ago, after. So, again, in context, what he says, and I'm stuck on it. He's just saying there's a potential. There's a risk. There's a risk. I can't tell you for sure when somebody has crossed the line. I'm not a pursuing exam. I'm not a legal expert. I'm not a lawyer. But I've seen enough to make me concerned, make me wary, and that's the reason for my change in investment. I guess everything you've said just kind of reinforces my view that this isn't an opinion. It doesn't apply to me. It's an opinion. It's an expression. It's an opinion. It's a personal opinion about what a level of risk is. But, again, you're at a good suit average here. Given the nature of the audience, given his expertise, given what he has done, given that he was introduced as having uncovered something that nobody else uncovered with Benrahm, given that he used words exactly how business is done in China, if he is going to state such an opinion, then under Milkovich and his progeny, he had an obligation to identify what the facts were that were supporting it. He needs to disclose the facts upon which he's basing his opinion, or if he doesn't, he risks that they will be inferred, explanatory facts will be inferred, as we argue here. That is, that there is something, something that he uncovered, some fact that he uncovered that, as your honor posits it, creates in his mind a risk that they will be found to be a violation of the SEC. And again, recall that the SEC documents that he relies on, particularly for the actual malice piece, are for events that occurred in Dostoyevsk, and in SEC filings that occurred in Dostoyevsk, he made this decision of some sort so they don't inform the issue of the favoritory meaning or favoritory falsehood. I don't know if you want to repeat your point. I do. I would like to restore the balance of my time. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. And he's the Court, Stephen Mayer for defendant Chaidos. He will start by talking about the proposition. Building in stance to the proposition, Danyan Katsiak has stated a fact that she was located with an opinion to get a free pass on the line proposal. So the amalgam of this statement was, in my heart I believe that the plaintiff committed perjury. But in every single case under amalgamism, if you strip away the language of concurrency, the language of belief, there's a core statement of declarative fact. The plaintiff did X. The plaintiff's product didn't work under the law code. The plaintiff lied in manufacturing orders. The plaintiff committed a new act and new things. Once you drill down and get rid of the apparency and the subjectivity, there's a core factual assertion. And, indeed, that's what building in stance to the proposition, that in order for a statement to be libelous, you need a core statement of declarative fact. You need something that's proven to be false. There is no such statement here. It's on the Supreme Court Records. It's not on the court record. Are you at risk of a proclamatory factuality that apparently should be adopted? No, it is not. And here's why. Let's look at what Mr. Chaney said. And, indeed, one of the interesting things about this case is that Mr. Chaney, on page 20 of his reply paper, that he has no quarrel with what Mr. Chaney's pastor said. So, in this, I've complained about Chaney's expression of concern about his client's investment, and his asserted perception that money is at risk. So his beef is not with anything Mr. Chaney said, but with what Mr. Chaney supposedly implied. The problem is that he can't meet the test that the court has established in determining when a statement of opinion crosses over the lines of a defamatory fact that's giving part to the so-forth and onward. And look at what Mr. Chaney said. I was concerned about the risk I was taking with my client's money under the FCPA. Every part of that statement reveals a possibility. What's at risk? If we look in the OED, risk is defined as the possibility of a cause, not actuality, not a statement of declarative fact, but a possibility. The patient might have said, I mean, what he says is, I'm sorry, about the risk under the FCPA. It seems like he's, it appears that he's, he's violating the medical school's, personal medical school's fact that we're violating the FCPA. No, no, that's not so, Your Honor, because the company's rule 10-K-2 stated that there was a risk under the FCPA that had nothing to do with what, with an actual violation. They said that even though, in several cases in the 10-Ks, that even though they believed that the company was in full compliance with the law, there was still a risk that the government might investigate, there was still a risk that the government might prosecute, there could be administrative sanctions, there could be civil penalties, and there could be criminal penalties. So all these risks were disclosed in the 10-Ks, and Shanoff said nothing at all. That wasn't expressed in much greater detail in those arguments. Now, Mr. Quinn says that what Shanoff said had a defamatory implication, but really the 10-Ks didn't have a defamatory implication. No one would believe the 10-Ks who believed that the company was liable in itself, and Shanoff didn't know more than say what was in the 10-Ks that specifically referred to the possibility of criminal prosecution. Shanoff never used the word violation, he never said that they were in violation of the law. All he said was that there were risks in the same statements that the 10-K made. So, you see, the risks and the concerns of possibility rather than actuality, I mean, no one also could think, Jamie's made a reference to, I was concerned about the risk I was taking with my client's money, and he's a fiduciary. He shouldn't, and it wouldn't be expected, to wait until there was evidence of an absolute violation before he sold his position. He would be expected, and the audience would understand, that he sold his position when he perceived that there was a risk. That's exactly what he perceived, he did exactly what he did, and did exactly what the 10-K disclosed. And he also used the words alter in FCBA, and he never used the word violation in the statement that Mr. O'Brien complains about. And what we know from the, again, from the 10-Ks, is that the risk did not depend on a violation. It was enough that Mr. O'Brien, all the 10-Ks who said, we believe we're complying with the law, but there's a risk because we know that OCATA committed many, many, many violations of the FCBA, and if those occurred on company property, or otherwise involved the company in civil or criminal investigations, there would be a risk, that's what the 10-Ks disclosed, and that's the 10-Ks disclosed. Now, let me say a few words about how to go else, because one of the things that, actually, let me talk a little bit about context, because we've heard their whole case really turns on context. You know, the court in Underwager has a three-part test to determine whether a statement of opinion implies proof of default. We've actually seen it. It means context, content, and proofability. And I've already said there's nothing provable here, because there's no false factual assertion. Indeed, to the extent there is a factual assertion, an assertion about risk, it's true. It's not false, and it couldn't be the basis of a libel case if the statement about risk is the same statement that was made in the 10-Ks. So, both the content of what Mr. Jacobson actually said, and the proofability factor point towards non-absolute ability. But when he says, this is all about context, you have to look at his reputation and the fact that he uncovered fraud and fraud. Now, I'll explain in a minute why context really doesn't help. It was a matter of fact. But I want to say something loud and clear, because we don't quite say it this way in the brief, but it's right. Context is one way street. Context can turn a fact into an opinion. If someone says, complaint is a murder, complaint is guilty of blackmail, that can certainly have a defamatory implication, but we know that if it's said in the context of the labor dispute or political campaign, that it's a non-actionable opinion. So context can think of something that might otherwise be actionable and turn it into a non-actionable opinion, but it does not work the other way. Context cannot think of something that's opinion and not actionable and turn it into fact. And the reason for that is that Milton says plainly that for statement to be actionable, it has to contain or comply with a false assertion of fact. And indeed, that can be an underweighter of the third flaw of the force test in determining whether a statement is actionable. It is, let me just quote it, because it's so important. It is whether the statement itself... The provability test turns out whether, quote, the statement itself is sufficiently factual to be capable of proving true or false. Let me ask you about a slightly different aspect of what you were trying to say there. You focus on the specific violations, but what about an accusation or whatever you want to call it that the company was accused of legal fraud and that... I don't know the latter part. And, I mean, he says pretty presumptively that there was still one in terms of its need and in terms of, obviously, contractual security. But, I mean, that was... Now, yeah, that's not an accusation of illegal conduct, obviously, because it was legal fraud. I would hurt if someone said that about me if I were a judge engaged in that kind of conduct. Why is it that? That's not what this case is about. This case is about slander per se. And slander per se requires an accusation of criminal conduct. It's not a... If it were just an ordinary slander, you'd have to pay special damages, which they didn't do. So, in this case, this case stands and falls on whether there's an accusation of a criminal violation, not legal fraud, whatever that is. Indeed, all the reasons, by the way, why there's no slander per se here, why there is no accusation of illegal or criminal conduct is not only that he was talking about risk, which means possibility and not actuality, and not only that he was using risk under the FCPA instead of violating the FCPA, but also because Jacobson twice said that there were people violating the law. People said they might be adhering to every aspect of legal requirements if they were engaged in illegal fraud. But, obviously, he didn't agree. He didn't like what he saw. He sold his investment, but he was really careful not to accuse them of having a record for what they may have wanted. In fact, twice stated that he had known that they had not done so. So, for that reason, too, you can't look at what he said and draw any accusation or any indication that there had been a claim or a finding of illegal activity. But let me look at the context. And that is what really shames its channel. And for the reasons I've said, even if everything is said about context is true and there was nothing on the other side, context couldn't carry the day because context is an open district. But it's really not nearly as restrictive as they suggest. And this is an academic symposium. It's a panel. People are giving their opinions. This isn't a news article in the New York Times or the Wall Street Journal. It's not an academic paper. People are giving off-the-cuff, extemporaneous opinions that, frankly, aren't the most articulate opinions in the world. Some people speak in whole paragraphs. Lawyers like to do that when they're arguing cases. Domesticators certainly do speak in whole paragraphs. It's a little rambling and a little disappointing. But no one could listen to him thinking this was an accusation of defamatory fact, particularly because of who he is. He's not a result. He's not a DA. He's not a U.S. attorney. He's not a private investigator. He doesn't have subpoena power. And he doesn't have the ability to sneak into his corporate offices and steal confidential documents. He is what he's alleged to be on the complaint. He's a reader of financial reports. So no one could conclude that Cheney was trying to first-hand knowledge or any other executive knowledge of criminal activity. Other people in the panel did. Mr. Barbosa did. Shreveport's Chao was in jail at the time, did. Steve Vickers was a cop, did. But not Mr. Cheney. He's not a DA. He was not a DA. But he's holding on to the crime. We asked, does that give him a little bit more credit than he was hearing? But perhaps you can also understand he's a reader of financial reports. And you know, apparently, that's part of why we were able to discover some of the crimes he's been involved in. Well, then, in my analogy, is it an analogy that Cheney was never used? I don't know. I'm not saying he did. But how much does he learn to focus on, you know, the content against the context? Here, he's not, I mean, he's a 63-month-old in this area. And I think regarding, especially for this particular sort of activity of distorting the content of whatever it is, is it related to his financial? What is well known is he's well known for making smart investment decisions based on research. And his research disclosed, and as you said, at the symposium, that there was a risk, the same risk, that had been acknowledged many, many times in the 10 years. And that's really all there is here. There's no implication of critical content at all. In fact, when he talked about risk, when he talked about, you know, the stewardship of his client's money, it's really just the opposite. I mean, no one's going to expect that Mr. Cheney is going to sit on his client's money until he finds an actual violation. And listeners are going to expect that he sold the stock, which he said he did, once he discovered that there was a risk. That's all he said. And that's all there is. Let me just say a few words about actual violence. And what I want to make clear is that Mr. Cheney says in pages 17 to 19 of his brief that they have to show plausibly, and I would pass the craft to Iqbal, that even if there was a defamatory implication, which I don't believe that was permitted, that Cheney intended the defamatory implication. They can't show that. First, because what Cheney has said, in fact, the 10Ks, those certainly didn't have a defamatory implication. And second, because of the statements that Cheney has made showing that there was no legal violation. So even if there was, even if some hypothetical reasonable listener wouldn't choose, could have assumed that there was, in fact, a defamatory implication, the implication could not have been intended by Mr. Cheney, which is necessary to prove actual violence. I'm closing my time is up. Thank you. Thank you. Gary's going to do his best to talk about a few things I want to say, but I want to make sure that I give my thoughts to address briefly and recite them again, because it's relevant. Regardless of whether I can just fix the defamatory implication or not. Here's what Mockridge says. Mockridge says, when the facts underlying a statement of opinion are disclosed, readers will understand that they are getting the author's interpretation of the facts presented. It goes on facts-comprising, but on the factual basis it's not disclosed. Quote, readers will reasonably understand the author to be implying he knows facts according to them. And whatever it is, there is a risk of an SBK violation, particularly if it is not proven, suggests there is something that he saw. Counsel says, and that's what the 10-Ks discussed, not true. And that's what Champs discussed, also not understood. Why is this important? It's important because, Mockridge is playing a national house. His whole theory is that everybody, a hypothetical figure, has access to the public to defend themselves. But when somebody has inclined defamatory facts about you, but it's not disclosed to a big bar, it makes it really hard to defend them. So if Mr. Janison said, look, I've looked at the 10-Ks, and they say, X, Y, and Z, then when's their position to say, well, let me tell you why the 10-Ks don't really reflect that. If Mr. Janison is an inside source in the company that is talking about bribes, which somebody could presume from the way he said it, then Mr. Winneman would be glad to come out and say, well, that person just got fired, and they have a reason to be against us, and you shouldn't blame them. They were denied the opportunity to defend themselves. That's the reason why a person who states their opinion in a way that suggests there's a list of your offense is responsible for whatever offense they might have affirmed. I will briefly, I just want to mention, again, I saw this last week. Your Honor, I know this isn't an issue that you've addressed before. Whether it's on bond review or not, I think, actually, the court can now decide that the California United States actually does not have a rule in the federal court in light of shady growth. In light of that, there's absolutely, in the circuits based on what's in the DC circuit, in light of that, the Mankoff Court just did not have on bond review, so it didn't decide the issue. It's important to answer your question, of course, you're going to the court, and of course, well, you're not going to revisit it, so I'll go back to that. What's changed since 2013 when the court said no? Well, first and foremost, one of the key reasons in the first paragraph of the opinion, in that much, in the Mankoff opinion, denying re-hearing of a bond, the court, the author, indicated that none of the basis for a re-bond review existed, including the fact that, in turn, it's a certain conflict, and that, in fact, the re-hearing of your statement, which is wrong, was that our re-three-judge panel came to something different, and that's just simply not true. If you want an addition for re-hearing a bond, again, go for it. I'm telling you, it's not, I would have zero optimism on your part of the hearing being granted, given what went down last time, but you can try this three-judge panel. Certainly, there's no objections, and I think it's really helpful. Thank you. Thank you very much. Thank you both for your very helpful answers, Mr. Lumberg and Mr. Rader. Thank you for your presentations today. On the case of Briggs v. Chavis, this has now been submitted. Our final case, case of R.A.C.O.U.P. v. the United States of America, has been submitted on the Briggs,
judges: Fernandez, Murguia, Watford